IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 12-cv-22072-KMM

ODEBRECHT CONSTRUCTION, INC.,
*a Florida corporation,*

      Plaintiff,

vs.

ANANTH PRASAD,
*in his official capacity as Secretary of*
*the Florida Department of Transportation,*

      Defendant.

_____/

## OPINION FOLLOWING ORDER GRANTING PRELIMINARY INJUNCTION

THIS MATTER is before the Court upon Plaintiff's Motion for a Preliminary Injunction (ECF No. 5). Plaintiff challenges the constitutionality of an amendment to section 287.135, Florida Statutes, "Prohibition against contracting with scrutinized companies." The amendment to section 287.135 can be found at Chapter 2012-196, Laws of Florida, and generally prohibits the State of Florida from awarding public contracts in excess of one million dollars to companies who have "business operations" in Cuba. Plaintiff argues that the amendment violates the following provisions of the United States Constitution: the Supremacy Clause, the Foreign Affairs Power, and the Foreign Commerce Clause. Plaintiff also argues the amendment is inoperative by its own terms. Defendant denies these claims and further argues Plaintiff cannot make the requisite showing necessary for this Court to issue a preliminary injunction. Following a hearing on Plaintiff's Motion for a Preliminary Injunction on Monday, June 25, 2012, and having considered Defendant's Response (ECF No. 15) and Plaintiff's Reply (ECF No. 16), this Court entered an Order Granting Plaintiff's Motion for a Preliminary Injunction (ECF No. 21).

1

This opinion follows and sets forth more fully the reasons for this Court's Order Granting Plaintiff's Motion for a Preliminary Injunction.

## I. THE PARTIES[1]

Established in 1990, Plaintiff Odebrecht Construction, Inc. is a Florida corporation that maintains its principal place of business in Coral Gables, Florida. Over the years, agencies of the State of Florida and local governments have awarded Plaintiff thirty-five projects amounting to approximately $3.9 billion, and in 2011, all of Plaintiff's revenue—approximately $214.5 million—was derived from public infrastructure and transportation projects. Recently, Broward County awarded Plaintiff a contract valued at approximately $226 million to renovate the Fort Lauderdale Airport.

Plaintiff is a subsidiary of Odebrecht S.A., a "diversified Brazilian conglomerate in the engineering, construction, water and wastewater, ethanol, real estate, chemical, and petrochemical fields." Am. Compl., ¶ 20 (ECF No. 4). Odebrecht S.A. engages in business operations in South America, Central America, North America, the Caribbean, Africa, Europe, and the Middle East. Though Plaintiff maintains that it has never conducted business operations in the Republic of Cuba, one of Odebrecht S.A.'s subsidiaries, COI Overseas Ltd., is involved in a construction project to expand the Cuban Port of Mariel. The project, at a cost of nearly $1 billion, is funded substantially by the Brazilian Development Bank. Brazilian President Dilma Rousseff traveled to the Port of Mariel to view the progress of the port's renovation as recently as February 2012. See Matthew Bristow & Cris Valerio, Rousseff in Cuba Points to U.S. Human Rights Record, BLOOMBERG, Feb. 6, 2012, available at http://www.bloomberg.com/news/2012-01-31/castro-rights-record-intrudes-on-rousseff-trade-mission-to-communist-cuba.html.

---

[1] The facts herein are taken from Plaintiff's Motion for a Preliminary Injunction (ECF No. 5), Defendant's Response (ECF No. 15), and Plaintiff's Reply (ECF No. 16).

Defendant Ananth Prasad is Secretary of the Florida Department of Transportation ("FDOT"). Established in 1969, FDOT is a decentralized agency charged with coordinating, maintaining, and regulating public transportation in the State of Florida. In furtherance of this duty, each of the agency's subdivisions is responsible for acquiring commodities and contractual services under the direction and guidance of Defendant. As Secretary of FDOT, Defendant is charged with implementing and enforcing the Cuba Amendment with respect to FDOT contracts valued at one million dollars or more.

## II. JURISDICTION

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to redress its claimed deprivation of rights, privileges, and immunities secured by the Constitution and the laws of the United States. Accordingly, jurisdiction lies in this Court pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1367(a).

## III. BACKGROUND

### A. The Cuba Amendment

On May 1, 2012, Florida Governor Rick Scott signed into law Committee Substitute for Committee Substitute for House Bill 99, which was codified at Chapter 2012-196, Laws of Florida (the "Cuba Amendment").[2] The Cuba Amendment is the most recent effort[3] by the State

---

[2] As counsel for Defendant correctly noted, the amendment also prohibits the State of Florida from awarding public contracts in excess of $1 million to companies who have "business operations" in Syria. Plaintiff, however, specifically challenges the aspects of the Amendment that relate to business operations with Cuba. For this reason, the Court refers to the Amendment as the "Cuba Amendment."

[3] The State of Florida and its municipalities have a long history of enacting legislation aimed at Cuba. See, e.g., Faculty Senate of Fla. Intern. Univ. v. Winn, 616 F.3d 1206 (11th Cir. 2010) (upholding constitutionality of Travel Act, which restricted Florida State universities from spending both state and "nonstate" funds on activities related to travel to a "terrorist state," as designated by the United States Department of State as a state sponsor of terrorism); ABC Charters, Inc. v. Bronson, 591 F. Supp. 2d 1272, 1304 (S.D. Fla. 2008) (enjoining enforcement of

of Florida to place pressure on Cuba[4] and provides, in relevant part, that a company "engaged in business operations in Cuba" may not "bid on, submit a proposal for, or enter into or renew a contract with an agency or local governmental entity for goods or services of $1 million or more." 2012 Fla. Laws 196, § 2(2) (amending FLA. STAT § 287.135).

For the purposes of the Cuba Amendment, a "company" is defined to mean any "entity or business association, including all wholly owned subsidiaries, majority-owned subsidiaries, parent companies, or affiliates of such entities or business associations, that exists for the purpose of making profit." FLA. STAT. § 215.473(c). "Business operations" is defined as "engaging in commerce in any form in Cuba or Syria." 2012 Fla. Laws 196, § 2(b). Taken together, the Cuba Amendment effectively encompasses domestic companies with no connection to Cuba other than by proxy.

The Cuba Amendment enforces its provisions through a certification requirement. Before submitting a bid or proposal for a contract, a company must certify that it does not have business operations in Cuba. Companies found to have submitted a false certification are subject to a "civil penalty equal to the greater of $2 million or twice the amount of the contract for which the false certification was submitted." Id. § 2(5)(a)(1). Additionally, once it has been determined

---

amendments to the Florida Sellers of Travel Act, which imposed onerous regulations and penalties on sellers of travel related services to Cuba); Miami Light Project v. Miami-Dade Cnty., 97 F. Supp. 2d 1174 (S.D. Fla. 2000) (enjoining enforcement of Miami–Dade County resolutions, which purported to ban Miami-Dade County from entering into a contract with any firm "deemed to be doing business directly or indirectly with Cuba" or "any individual who has traveled to Cuba in violation of U.S. travel restrictions during the preceding ten years").

[4] As Florida Governor Rick Scott noted in a letter to Florida Secretary of State Ken Detzner, "It is imperative that Florida and the United States continue to place economic pressure on the Cuban and Syrian governments. Only by bringing to bear every weapon in our arsenal can we affect true change. [The Cuba Amendment] demonstrates Florida's commitment to spreading political and economic freedom in Cuba." Pl.'s Mot., Ex. 1-B (ECF No. 5-3).

that a company's certification was false, the company is rendered ineligible to bid on any contract with an agency or local governmental entity for three years. Id. § 2(5)(a)(2).

B. Federal Law Relating to Cuba

In the five decades following the communist takeover of Cuba in 1959, the federal government has enacted a complex and comprehensive set of sanctions against Cuba. The Cuban Assets Control Regulations, 31 C.F.R pt. 515 (the "Regulations"), were issued by the federal government on July 8, 1963, under the Trading With the Enemy Act ("TWEA"), 50 U.S.C. app. § 5(b).[5] The Regulations apply to all persons and entities subject to United States jurisdiction and generally prohibit trade with Cuba and travel to Cuba. See 31 C.F.R pt. 515. The Regulations are administered by the Department of the Treasury's Office of Foreign Assets Control ("OFAC") and the Executive Branch has considerable discretion regarding the scope and implementation of the Regulations. Id.

The Cuban Democracy Act of 1992 ("CDA"), 22 U.S.C. §§ 6001-6010, was enacted in response to the Cuban government's "consistent disregard for internationally accepted standards of human rights and . . . democratic values." Id. § 6001. The CDA, *inter alia*, prohibits foreign-

---

[5] In 1977 Congress amended the Trading With the Enemy Act ("TWEA") to apply only during times of declared war, and enacted the International Emergency Economic Powers Act of 1977, 50 U.S.C. §§ 1701-1706 for non-wartime emergencies. See Act of Dec. 28, 1977, Pub. L. No. 95-223, 91 Stat. 1625 (codified at 50 U.S.C. §§ 1701-1706, app. § 5(b) (1976 & Supp. IV 1980)); see also Note, The International Emergency Economic Powers Act: A Congressional Attempt to Control Presidential Emergency Power, 96 HARV. L. REV. 1102, 1106–07 (1983). As the United States Supreme Court has explained, "rather than requiring the President to declare a new national emergency in order to continue existing economic embargoes, such as that against Cuba, Congress decided to grandfather existing exercises of the President's 'national emergency' authorities." Regan v. Wald, 468 U.S. 222, 229 (1984) ("This grandfather provision also provided that '[t]he President may extend the exercise of such authorities for one-year periods upon a determination for each such extension that the exercise of such authorities with respect to such country for another year is in the national interest of the United States.'" (quoting 50 U.S.C. app. § 5(b))). It is under these circumstances that the Cuban Assets Control Regulations remain in effect.

based subsidiaries of companies located in the United States from trading with Cuba, see id. § 6005(a), and empowers the President, subject to the President's own discretion, to sanction other countries doing business with Cuba by withholding aid under the Foreign Assistance Act of 1961, 22 U.S.C. § 2151.  See 22 U.S.C. § 6003(b)(A).  The CDA allows the President to waive the sanctions imposed by the CDA should the President determine that the Cuban government has taken action consistent with the promotion of democracy as specifically delineated by the CDA.  See id. § 6007.

The Cuban Liberty and Democratic Solidarity Act of 1996 ("Libertad Act"), 22 U.S.C. §§ 6021-6091,[6] was enacted shortly after the Cuban government downed two private planes carrying anti-Castro Cuban-Americans.  See 22 U.S.C. § 6046; see also Tim Weiner, Clinton Considers Punishing Cubans for Plane Attack, N.Y. TIMES, Feb. 25, 1996, at A1.  The Libertad Act is divided into four titles, preceded by sections containing Findings, Purposes, and Definitions. Title I, "Strengthening International Sanctions Against the Castro Government," codifies economic sanctions against Cuba, while also, inter alia, prohibiting indirect financing of Cuba and instructing the President to oppose Cuban membership at various international organizations and institutions.  See 22 U.S.C. §§ 6021-6046.  Title II, "Assistance to a Free and Independent Cuba," authorizes the President, after consulting with Congress, to take different steps to assist a "transition government or a democratically elected government in Cuba."  See id. §§ 6061-6067. This includes empowering the President to suspend economic sanctions.  Id. § 6064.  Title III, "Protection of Property Rights of United States Nationals," creates a statutory right of action against any person or entity who traffics property confiscated by the Cuban government from any American citizen or company.  See id. §§ 6081-6085.  Title IV, "Exclusion of Certain Aliens,"

---

[6] The Libertad Act is also commonly referred to as the Helms-Burton Act.

excludes from the United States, *inter alia,* any alien who "traffics in confiscated property, a claim to which is owned by a United States national," or any "corporate officer, principal, or shareholder with a controlling interest of an entity which has been involved in the confiscation of property or trafficking in confiscated property, a claim to which is owned by a United States national." Id. § 6091.

The passage of the Libertad Act caused an international uproar among United States' allies due to the extraterritorial reach of Title III. See Clyde H. Farnsworth, Canada Warns U.S. on Law Penalizing Cuba Commerce, N.Y. TIMES, June 18, 1996, at D6 ("Canada and Mexico also announced today that they would file a complaint against the Helms-Burton Act under the North American Free Trade Agreement."). The European Union adopted regulations declaring the extraterritorial provisions of the Helms–Burton Act to be unenforceable within the EU. See Council Regulation 2271/96, Protecting Against the Effects of the Extra-Territorial Application of Legislation Adopted By a Third Country, and Actions Based Thereon or Resulting Therefrom, 1996 O.J. (L 309); see also Jürgen Huber, The Helms-Burton Blocking Statute of the European Union, 20 FORDHAM INT'L L.J. 699, 701 (1997) (chronicling the passage of EU regulations designed to neutralize the effect of the Libertad Act). The United Kingdom, Mexico, and Canada passed similar measures. See The Extraterritorial US Legislation (Sanctions against Cuba, Iran and Libya) (Protection of Trading Interests) Order (1996), SI 1996/3171; Foreign Extraterritorial Measures Act (FEMA), R.S.C., ch. F-29, § 5 (1985) (Can.), reprinted in 24 I.L.M. 794; An Act to Amend the Foreign Extraterritorial Measures Act, Bill C-54 (1996), reprinted in 36 I.L.M. 115 (1997); "Ley de proteccion al comercio y la inversion de normas extranjeras que contravengan el

derecho internacional" (Commerce and Foreign Standards Investment Protection Law Contravening the International Law), D.O., Oct. 23, 1996, reprinted in 36 I.L.M. 133 (1997).[7]

Importantly, the Libertad Act contains a waiver provision, which allows the President to suspend Title III for a period of six months should the President determine "the suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba." See 22 U.S.C. § 6085. In light of foreign reaction to Title III of the Libertad Act, President Clinton invoked the Libertad Act's waiver provision on July 16, 1996. See Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity (Libertad) Act of 1996, 32 WEEKLY COMP. PRES. DOC. 1265 (July 16, 1996). Title III has since been waived every six months, first by President Clinton, then by President Bush, and most recently by President Obama, and has never effectively been applied.

Adding to the numerous federal regulations governing relations with Cuba is the Trade Sanctions Reform and Export Enhancement Act of 2000, 22 U.S.C. §§ 7201-7209. The Trade Sanctions Reform and Export Enhancement Act relaxed various agricultural and medical sanctions with respect to Cuba. Id. More recently, President Obama has relaxed restrictions on Cuba by amending the Regulations to allow, *inter alia*, religious organizations to sponsor religious travel to Cuba under a general license; accredited institutions of higher education to sponsor travel to Cuba; and any U.S. person to send remittances to non-family members in Cuba

---

[7] Additionally, the Godfrey-Milliken Bill, officially Bill C-339: "The American Liberty and Democratic Solidarity (Loyalty) Act," was a satirical bill introduced in Canadian Parliament. The bill would have allowed "descendants of Tories, whose property was confiscated without compensation by the Continental Congress during the American Revolution, to file suit in Canadian court against any entity that it is 'trafficking' in such property." Leslie R. Goldberg, Comment, Trade Policy and Election-Year Policies: The Truth about Title III of the Helms-Burton Act, 18 NW. J. INT'L L. & BUS. 217, 237 (1997). The bill was never passed.

to support private economic activity.  MARK P. SULLIVAN, CONGR. RESEARCH SERV., RL 31139, CUBA: U.S. RESTRICTIONS ON TRAVEL AND REMITTANCES 5–17 (2011).

## IV. LEGAL STANDARD

A district court may issue a preliminary injunction where the moving party demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998).  "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'" as to each of the four prerequisites.  McDonald's Corp., 147 F.3d at 1306 (internal citations and quotations omitted).

## V. Analysis

### A. Substantial Likelihood of Success

Plaintiff argues that the Cuba Amendment violates the following provisions of the United States Constitution: the Supremacy Clause, the Foreign Affairs Power, and the Foreign Commerce Clause.  Plaintiff also argues the amendment is inoperative by its own terms.  This Court now analyzes Plaintiff's likelihood of success with respect to each of these claims.

#### 1. The Supremacy Clause & Federal Preemption

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." Arizona v. United States, __ U.S. __ (2012) (slip op., at 7) (citing Gregory v. Ashcroft, 501 U. S. 452, 457 (1991)).  To resolve conflicts between laws of the two sovereigns, the United States

9

Constitution provides, "This Constitution, and the Laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Accordingly, a fundamental principle of the Constitution is that Congress has the power to preempt state law. Even absent an express provision for preemption, see Chamber of Commerce of U.S. v. Whiting, 131 S. Ct. 1968, 1977 (2011), the Supreme Court has held that state law must yield to a congressional act in at least two other circumstances. First, "[w]hen Congress intends federal law to 'occupy the field,' state law in that area is preempted." Crosby v. Nat'l Foreign Relations Council, 530 U.S. 363, 372 (2000) (citing California v. ARC Am. Corp., 490 U.S. 93, 100 (1989). Second, "even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute." Id. (citing Hines v. Davidowitz, 312 U.S. 52, 66–67 (1941).[8] A conflict exists when it is impossible for a private party to comply with both federal and state law, id., and "where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Id. at 373 (quoting Hines, 312 U.S. at 67).

In Crosby, the Supreme Court scrutinized a Massachusetts state law that prohibited state entities from purchasing goods or services from any person or entity doing business with Burma. The state law defined "doing business" to cover, inter alia, any entity "having any operations, leases, franchises, majority-owned subsidiaries, distribution agreements, or any other similar

---

[8] The Supreme Court has recognized that these categories are not "rigidly distinct." See Crosby v. Nat'l Foreign Relations Council, 530 U.S. 363, 366 n.6 (2000) ("Because a variety of state laws and regulations may conflict with a federal statute, whether because a private party cannot comply with both sets of provisions or because the objectives of the federal statute are frustrated, 'field pre-emption may be understood as a species of conflict pre-emption.'" (quoting English v. Gen. Elec. Co., 496 U.S. 72, 79, n.5 (1990))).

agreements in Burma (Myanmar), or being the majority-owned subsidiary, licensee or franchise of such a person." Crosby, 530 U.S. at 367.  Three months after the Massachusetts law was enacted, Congress passed a statute imposing sanctions on Burma.  Id. at 368.  The federal sanctions imposed direct sanctions on Burma, vested the President with the power to impose further sanctions subject to certain conditions, and directed the President to develop a multilateral strategy to foster democracy and improve human rights in Burma. Id. at 369.

The Supreme Court held that the Massachusetts state law conflicted with the federal statute imposing sanctions on Burma for three reasons.  First, the state law frustrated the President's discretion to control economic sanctions against Burma.  Id. at 373–74.  Second, the state law regulated a broader set of entities and activities than the federal law and imposed different penalties. Id. at 376–79.  Third, the state law interfered with the President's directive to "develop a multilateral strategy" by obstructing the President's ability to "speak for the Nation with one voice in dealing with other governments."  Id. at 381.  Here, the Cuba Amendment suffers from the same shortcomings and for these reasons is likely unconstitutional.

The Cuba Amendment frustrates the President's discretion to carefully calibrate sanctions against Cuba in accordance with U.S. foreign policy objectives.  As noted, the CDA allows the President to waive the sanctions imposed by the CDA should the President determine that the Cuban government has taken action consistent with the promotion of democracy as specifically delineated by the CDA.  See 22 U.S.C. § 6007.  The Libertad Act also contains a waiver provision, which allows the President to suspend various economic sanctions against Cuba, and those doing business with Cuba, should the President determine "the suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba." See 22 U.S.C. § 6085.  The fact that every President since the Libertad Act's enactment has

decided to invoke the Act's waiver provision demonstrates the President's careful calibration of sanctions against Cuba and clearly evinces the federal government's intent not to penalize foreign companies who do business with Cuba. This is in stark contrast to the Cuba Amendment, which forces foreign companies with domestic subsidiaries—specifically exempted from the federal government's sanctions—to choose between doing business with Florida and Cuba. The Cuba Amendment affords the President no discretion to control what amounts to a de facto economic sanction above and beyond what the federal government has decided to be the appropriate amount of economic sanctions.

The Cuba Amendment also regulates a broader set of entities and activities than federal law and imposes different penalties. It is worth repeating that the Cuba Amendment penalizes domestic entities for the business operations of their parent company. The Cuba Amendment's effect thus reaches far beyond domestic interaction with Cuba. This is not unlike the extraterritorial reach of Title III to the Libertad Act which spurned international condemnation and was ultimately waived by three consecutive Presidents. Moreover, the Cuba Amendment penalizes domestic companies having business operations in Cuba without exception, which conflicts with the carefully crafted exemptions contained in the Trade Sanctions Reform and Export Enhancement Act of 2000, 22 U.S.C. §§ 7201-7209. The Cuba Amendment also imposes different penalties than those prescribed by federal law. Companies who violate the Cuba Amendment are liable to face civil fines and are prohibited from bidding on any contract with a Florida agency or local governmental entity for three years. These penalties are markedly different from the penalties administered by OFAC for violation of federal law.

Finally, the Cuba Amendment interferes with the President's directive under the Libertad Act and other federal statutes to foster democracy and assist a democratically elected government

12

in Cuba.  As the Supreme Court observed, one of the President's key powers of persuasion in the foreign policy arena is the power to "bargain for the benefits of access to the entire national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics." Crosby, 530 U.S. at 381.  "When such exceptions do qualify his capacity to present a coherent position on behalf of the national economy, he is weakened, of course, not only in dealing with the . . . regime, but in working together with other nations in hopes of reaching common policy and 'comprehensive' strategy."   Id. at 381–82.  The Cuba Amendment thus diminishes the President's bargaining power by imposing inconsistent sanctions not subject to the President's discretion.

Defendant argues that there is no conflict because nothing in the Cuba Amendment "allows that which the federal framework prohibits." Resp., at 9.  This is only one way of analyzing a potential conflict and ignores Crosby's admonition that "[s]anctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions here undermines the congressional calibration of force." Crosby, 530 U.S. at 380; see also id. at 376 (finding a conflict between federal and state law because "the state statute penalizes some private action that the federal Act (as administered by the President) may allow, and pulls levers of influence that the federal Act does not reach.").   Next, Defendant argues that reliance on Crosby is misguided because unlike in Crosby, the President does not have broad authority to calibrate sanctions against Cuba.  Resp., at 9.  As evidenced by the numerous federal provisions vesting the President with the power to waive or suspend sanctions against Cuba—as well as three Presidents' decisions to actually invoke such power—this argument is simply untrue. Finally, Defendant argues that any claim regarding the Cuba Amendment's alleged impairment of the President's power to speak and bargain effectively with other nations is speculative

because the Cuba Amendment has not yet taken effect.  According to Defendant, "no complaint has been filed with the WTO."  Id.  This Court, however, should not be forced to wait until a formal WTO complaint is filed before enjoining a statute that on its face clearly diminishes the President's bargaining power in the foreign affairs arena.

Notwithstanding the Cuba Amendment's conflict with federal law, Congress has clearly intended to "occupy the field" relating to this country's policy toward Cuba.  Federal law regulates all aspects of commerce with Cuba, including but not limited to the importation and exportation of various goods and services, travel between the United States and Cuba, and private rights of action against the Cuban government.  See ABC Charters, Inc. v. Bronson, 591 F. Supp. 2d 1272, 1304 (S.D. Fla. 2008) ("The federal government made clear in the Trading With the Enemy Act and related regulations that it intends to occupy the field when it comes to regulating interactions with Cuba. Under Natsios, the Trading With the Enemy Act is the prime example of when the government acts 'in an area of unique federal concern and has crafted a balanced, tailored approach to an issue.'" (quoting Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 77 (1st Cir. 1999))); see also supra Part III.B (chronicling federal laws relating to Cuba).  Because the Cuba Amendment frustrates the "balanced, tailored approach" of the federal scheme, Natsios, 181 F.3d at 77, the Cuba Amendment is likely unconstitutional.

Defendant argues that Faculty Senate of Florida Intern. University v. Winn, 616 F.3d 1206 (11th Cir. 2010) is controlling and that the field is not preempted.  The Eleventh Circuit in Faculty Senate found no field preemption with respect to a Florida statute that prohibited "State or non-State funds" made available to state universities from being used to travel to any nation designated by the United States Department of State as a state sponsor of terrorism.  Faculty Senate, however, is distinguishable for many reasons, not least being the Eleventh Circuit's

distinction between the Florida statute, which does "not attempt to prohibit, or even to obstruct, trading broadly by anyone with anyone," and selective-procurement laws—such as the Cuba Amendment—where "[t]he obvious idea [i]s to reduce trade across-the-board." Id. at 1209. Faculty Senate is thus inapposite and this Court holds that the field is likely preempted.

2. The Federal Government's Foreign Affairs Power

The Constitution grants the federal government vast power over foreign affairs. U.S. CONST. art. I, §§ 8, 9, 10; U.S. CONST. art. II, § 2; see also Made in the USA Found. v. United States, 242 F.3d 1300, 1313 (11th Cir. 2001). This exclusive grant of power reflects a practical concern because "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." Hines, 312 U.S. at 63.  For a state statute to encroach on the federal government's Foreign Affairs Power, it must have more than "some incidental or indirect effect in foreign countries," and have the potential for diplomatic "disruption or embarrassment." Zschernig v. Miller, 389 U.S. 429, 434–35 (1968).

Here, the Parties exert considerable effort contesting the applicability of a United States Court of Appeals for the First Circuit precedent that articulates a five factor test for determining when a statute's effect on foreign countries is more than "incidental or indirect." See Natsios, 181 F.3d at 53.[9]  Noting a void in circuit precedent, the district court in ABC Charters relied on these factors to hold that a separate Florida state statute—the Florida Travel Act Amendments—

---

[9] Those five factors that a court must weigh are: (1) the design and intent of the law; (2) the amount of purchasing power the law affected; (3) the possibility of other states following the example; (4) the protests lodged by other foreign countries; and (5) the differences between the state and federal approaches.  Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 53 (1st Cir. 1999).

violated the federal government's Foreign Affairs Power.  See ABC Charters, 591 F. Supp. 2d at 1295 n.24.  Subsequent to ABC Charters, however, the Eleventh Circuit in Faculty Senate did not address the Natsios factors when analyzing whether the statute at issue violated the Foreign Affairs Power.

This Court finds it unnecessary to rigidly adhere to the First Circuit's five factor test.  It is sufficient to hold that the Cuba Amendment likely violates the general criteria established in Zschernig v. Miller, which is to say, the Cuba Amendment has more than an incidental or indirect effect on foreign countries and has the potential for diplomatic disruption or embarrassment.  The Cuba Amendment forces foreign companies to choose between doing business with Florida and lawful business with Cuba.  This affects not only Cuba, but governments that transact with Cuba and Florida, including Brazil and Canada.  Such is the case here.  Plaintiff's parent company is involved in a project to expand the Cuban Port of Mariel.  As noted, the project, at a cost of nearly $1 billion, is funded substantially by the Brazilian Development Bank.  Indeed, Brazil has already protested the Cuba Amendment.  See Patricia Mazzei, Fla.'s Trading Partners Warn of Backlash if Gov. Scott Signs New Anti-Cuba Legislation, MIAMI HERALD, Apr. 21, 2012, 2012 WLNR 8486321 ("Canada is one of Florida's largest trading partners, second only to Brazil — whose similar complaints about the law have gone all the way to Washington.  Brazilian Minister of Trade and Industry Fernando Pimentel brought up Florida House Bill 959 earlier this month with U.S. Commerce Secretary John Bryson . . . ."); see also Simon Romero & Jackie Calmes, Brazil and U.S. Accentuate the Positive, N.Y. TIMES, Apr. 10, 2012, at A10 ("Other issues weigh on [United States-Brazil] relations, like a new Florida law targeting companies that do business with Cuba by preventing local governments from hiring them. The law could complicate matters for Odebrecht, one of Brazil's largest

construction companies, which is upgrading the Port of Miami at the same time it is building Cuba's Port of Mariel."). Foreign relations involve the delicate balancing of issues, and the Cuba Amendment, the effect of which is exacerbated by the State of Florida's traditional role as a flashpoint of United States-Cuba foreign policy, clearly possesses the potential to disrupt the federal government's handling of these issues. See United States v. Yoshida Intern., Inc., 526 F.2d 560, 580 (C.C.P.A. 1975) ("As the world has grown smaller and trade more complex, foreign exchange rates, international monetary reserves, balances of payments, and trade barriers have become increasingly intertwined, with trade barriers being used as tools in furtherance of foreign policy.").

### 3. Foreign Commerce Clause

The United States Constitution grants Congress the power to "regulate Commerce with foreign Nations." U.S. CONST. art. I, § 8, cl. 3. The Supreme Court has consistently recognized that this allocation of power implicitly contains a negative command, known as the dormant Commerce Clause, which prohibits certain state action even absent Congressional legislation or regulation. See Okla. Tax Com'n v. Jefferson Lines, Inc., 514 U.S. 175, 179 (1995) (citing Quill Corp. v. North Dakota, 504 U.S. 298, 309 (1992); Nw. States Portland Cement Co. v. Minnesota, 358 U.S. 450, 458 (1959); H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 534-535 (1949)). The Foreign Commerce Clause in particular recognizes that "'with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power.'" Japan Line, Ltd. v. Los Angeles Cnty., 441 U.S. 434, 448 (1979) (quoting Bd. of Tr. v. United States, 289 U.S. 48, 59 (1933)).[10]

---

[10] It is important to note that the Foreign Commerce Clause is distinct from the Foreign Affairs Power, discussed supra. As one article explains, "The dormant Foreign Commerce Clause arises solely out of the power 'to regulate Commerce with foreign Nations'" while the Foreign Affairs

In Japan Line, Ltd. v. Los Angeles County, the Supreme Court held that the power conferred under the Foreign Commerce Clause is greater than the power conferred by the Interstate Commerce Clause.  441 U.S. at 448.  This is because discriminatory treatment of foreign commerce "may create problems, such as the potential for international retaliation, that concern the Nation as a whole." Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin., 505 U.S. 71, 79 (1992) (citing Japan Line, 441 U.S. at 450).  Accordingly, the Supreme Court held that a state law violates the Foreign Commerce Clause when it "impair[s] federal uniformity in an area where federal uniformity is essential," and "prevents this Nation from 'speaking with one voice' in regulating foreign trade." Japan Line, 441 U.S. at 448–53.[11]  Later, the Supreme Court qualified Japan Line by holding that absent an explicit directive from Congress, a state law does not violate the Foreign Commerce Clause if it merely has "foreign resonances" but does not "implicate foreign affairs." Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 194 (1983).   A state law "at variance with federal policy" will thus violate the "one voice" standard articulated in Japan Line if it "either implicates foreign policy issues which must be left to the Federal Government or violates a clear federal directive." Id.  As the Supreme Court observed, "the second of these considerations is, of course, essentially a species of preemption analysis." Id.

---

Power "is implied out of the grants of power to the federal government as a whole throughout the Constitution, as well as the restrictions on the states from engaging in certain foreign affairs activities in Article I." Leanne M. Wilson, Note, The Fate of the Dormant Foreign Commerce Clause After Garamendi and Crosby, 107 COLUM. L. REV. 746, 760 (2007).  Consequently, "the dormant Foreign Commerce Clause only invalidates state legislation that affects foreign commerce; the dormant foreign affairs power can invalidate all state legislation that interferes with the federal government's foreign affairs power." Id.

[11] The Supreme Court noted that these two requirements were in addition to the requirements articulated in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 (1977) (analyzing a state tax under the Interstate Commerce Clause).

Here, it is highly likely that the Cuba Amendment violates the Foreign Commerce Clause. The Cuba Amendment facially discriminates against foreign companies who do lawful business with Cuba by banning them from state procurement opportunities. This also amounts to an attempt by Florida to regulate economic activity beyond its borders that implicates foreign affairs and impairs federal uniformity. See supra Part V.A.1 (describing the conflict between federal law and the Cuba Amendment); supra Part V.A.2 (highlighting protests from trade partners); see also Natsios, 181 F.3d at 69 ("Massachusetts may not regulate conduct wholly beyond its borders. Yet the Massachusetts Burma Law—by conditioning state procurement decisions on conduct that occurs in Burma—does just that."). For largely the same reasons, the Cuba Amendment impedes the federal government's ability to speak with one voice in regulating foreign trade. See Patricia Mazzei, Fla.'s Trading Partners Warn of Backlash if Gov. Scott Signs New Anti-Cuba Legislation, MIAMI HERALD, Apr. 21, 2012, 2012 WLNR 8486321 ("Brazilian Minister of Trade and Industry Fernando Pimentel brought up Florida House Bill 959 earlier this month with U.S. Commerce Secretary John Bryson, who told him the administration could not do anything until the state legislation becomes law . . . ."). Finally, the Cuba Amendment is not "demonstrably justified," New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 274 (1988), because the federal government has already enacted widespread regulation designed to safeguard this country. See Trading With the Enemy Act, 50 U.S.C. app. § 5(b); see also ABC Charters, 591 F. Supp. 2d at 1305.

Defendant relies exclusively on Interstate Commerce Clause precedent to argue that it is categorically exempt from constitutional restrictions when it enters into public contracts due to the market-participant exception. Resp., at 14–15 (citing White v. Mass. Council of Constr.

Emp., Inc., 460 U.S. 204, 206 (1983); Reeves, Inc. v. Stake, 447 U.S. 429 (1980)).[12]  This ignores, however, the fact that the constitutional prohibition of state discrimination against foreign commerce is broader than the protection afforded to normal interstate commerce.  Japan Line, 441 U.S. at 448.  For this reason, Plaintiff argues that the Supreme Court has impliedly held the market-participation exception inapplicable to the Foreign Commerce Clause.  Reply, at 7 (citing Reeves, 447 U.S. at 437 n.9 ("[S]crutiny may well be more rigorous when a restraint on foreign commerce is alleged.").

Even if the market-participation exception is applicable to the Foreign Commerce Clause, however, the Cuba Amendment does not satisfy the exception.  This is because the market-participation exception is not "carte blanche to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity."  South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 97 (1984).  According to the Supreme Court,

> The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market

Id.  Here, The Cuba Amendment uses Florida's leverage in the public contracting market (in which it does participate) to exert an effect on the market consisting of companies engaging in lawful trade with Cuba (in which it does not participate). This is exactly the downstream effect the market participant doctrine forbids. Consequently, the Cuba Amendment likely violates the Foreign Commerce Clause.

---

[12] The market participation exception recognizes that States are not constitutionally limited by the Commerce Clause when they operate as actors within a market as opposed to regulators of the market. See Hughes v. Alexandria Scrap Corp., 426 U.S. 794 (1976).

### 4. Inoperative By Its Own Terms

Section 9 of the Cuba Amendment states, "This section becomes inoperative on the date that federal law ceases to authorize the states to adopt and enforce the contracting prohibitions of the type provided for in this section." In contrast to Sudan and Iran—the countries FLA. STAT § 287.135 originally addressed—Congress has not authorized state-level sanctions against Cuba. For this reason, and for the three constitutional reasons articulated in this opinion, see supra Part V.A.1–3, it is highly likely that the Cuba Amendment is inoperative by its own terms.

Defendant urges this Court to resort to "every reasonable construction" to "save" the statute from being declared unconstitutional. Resp., at 16 (citing Gonzales v. Carhart, 550 U.S. 124, 153 (2007)). According to Defendant, the Court should read Section 9 of the Cuba Amendment "to mean that, in the event the Secretary of State removes one of the countries affected by the Act from the State Sponsors of Terrorism list, the contracting prohibitions in the Act would no longer be enforceable." Defendant provides no support for this interpretation and the interpretation contradicts the express terms of Section 9.

### B. Irreparable Harm or Injury

Plaintiff argues that it will suffer irreparable harm if the Cuba Amendment takes effect for three reasons: (1) the loss of its right to compete for state contracts, (2) the loss of revenues and profits from contracts,[13] and (3) interference with its ability to partner with other firms and hire and retain employees. Defendant makes much of Northeastern Florida Chapter of the Ass'n of General Contractors of America v. City of Jacksonville, 896 F.2d 1283 (11th Cir. 1990), where the Eleventh Circuit held that irreparable harm does not result from a contractor's inability to bid

---

[13] As noted, State of Florida agencies and local governments have awarded Plaintiff thirty-five projects amounting to approximately $3.9 billion, and in 2011, all of Plaintiff's revenue—approximately $214.5 million—was derived from public infrastructure and transportation projects. See supra Part. I.

on a contract.  The contractor in <u>Northeastern Florida</u>, however, possessed the ability to sue the municipality for money damages.  Here, Plaintiff's claims for money damages are barred by the Eleventh Amendment.[14]  When a plaintiff faces significant economic harm but cannot sue the state of Florida for money damages, "harm is irreparable as a matter of law."  <u>ABC Charters</u>, 591 F. Supp. 2d at 1310 (citing <u>Temple Univ. v. White</u>, 941 F.2d 201, 215 (3d Cir. 1991); <u>Am. Fin. Servs. Ass'n v. Burke</u>, 169 F. Supp. 2d 62, 70 (D. Conn. 2001); <u>D.A.B.E., Inc. v. Toledo–Lucas County Bd. of Health</u>, No. 3:01 CV 7334, 2001 WL 1916730 (N.D. Ohio, Jul. 6, 2001); <u>Clark Constr. Co., Inc. v. Pena</u>, 930 F. Supp. 1470, 1479–80 (M.D. Ala. 1996)).  Therefore, Defendant's argument is inapposite and Plaintiff has adequately proven irreparable harm.

      C. <u>The Threatened Injury to the Movant Outweighs</u>

      Defendant argues that an injunction would harm the Department's ability to carry out its duty to responsibly allocate limited public resources.  Defendant, however, has not shown that the status quo has presented a problem or injured anyone.  Moreover, the federal government has already enacted widespread regulation designed to safeguard this country.  <u>See</u> Trading With the Enemy Act, 50 U.S.C. App. § 5(b); <u>see also</u> <u>ABC Charters</u>, 591 F. Supp. 2d at 1305.  Defendant will continue to derive a great benefit from the status quo every time Defendant awards a lower priced contract to a business such as Plaintiff's.  In contrast, Plaintiff will be irreparably harmed if the Cuba Amendment is not enjoined.  Therefore, the threatened injury to Plaintiff outweighs any alleged damage the proposed injunction may cause Defendant.

---

[14] <u>Ex Parte Young</u>, 209 U.S. 123 (1908) holds that the Eleventh Amendment does not bar a federal action for injunctive relief against a state official charged with enforcing legislation. Under <u>Ex Parte Young</u>, however, monetary damages are unavailable.

### D. The Public Interest

Defendant argues that the "public, through its elected representatives, has made clear that it will no longer do business with those who would do business with countries designated by the federal government as state sponsors of terrorism. Enjoining the Department from enforcing the Act could frustrate that interest." Resp., at 20. This overlooks the fact that the public interest is already sufficiently protected by federal law, see supra Part II.B, and that the public interest is even greater served through a unified federal policy toward Cuba that is not impeded or restricted by Defendant.

## VI. Conclusion

A preliminary injunction is intended to merely "preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981); Canal Auth. of the State of Fla. v. Callaway, 489 F.2d 567, 573 (5th Cir. 1974). As the district court in ABC Charters observed, "[g]iven this limited purpose, a party 'is not required to prove his case in full at a preliminary-injunction hearing' and the 'findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" ABC Charters, 591 F. Supp. 2d at 1310 (quoting Camenisch, 451 U.S. at 395). Accordingly, for the reasons contained herein, this Court concludes there is a substantial likelihood that the Cuba Amendment will be found unconstitutional under the Supremacy Clause, Federal Foreign Affairs Power, and the Foreign Commerce Clause.

DONE AND ORDERED in Chambers at Miami, Florida, this 29th day of June, 2012.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:     All counsel of record